J-S56020-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMEICE NASH | : | |
| | : | |
| Appellant | : | No. 716 EDA 2018 |

Appeal from the Judgment of Sentence September 12, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0011415-2013

BEFORE:  PANELLA, P.J., OLSON, J., and NICHOLS, J.

MEMORANDUM BY OLSON, J.:                    **FILED AUGUST 03, 2020**

Appellant, Jameice Nash, appeals from the judgment of sentence entered on September 12, 2017, as made final by the denial of Appellant's post-sentence motion on February 16, 2018.  We vacate Appellant's judgment of sentence in part.  Specifically, we vacate the portion of Appellant's judgment of sentence, wherein Appellant received a concurrent term of ten to 20 years in prison for aggravated assault.  However, since our ruling does not disturb the trial court's sentencing scheme, we will not remand this case for resentencing.

On the morning of June 12, 2013, Appellant slit his seven-year-old daughter's throat with a knife.  He was arrested that day and was later charged with attempted murder, aggravated assault as a felony of the first degree, and other crimes.  Following a number of continuances – all of which

were at Appellant's request – Appellant proceeded to a bench trial on June 7, 2017. The following evidence was presented during Appellant's trial.

Philadelphia Police Officer Chad Jeter testified that, at 7:36 a.m. on June 12, 2013, he responded to the area of Clivenden and Belfield Streets in Philadelphia for a report of a person with a weapon. He testified:

> I pulled up and I exited my vehicle when I observed [Appellant] holding a little girl with his left hand and a knife in his right hand. I then said to him to drop the knife, he threw it in the grass, then he let her go.
>
> So then she ran towards my way and I asked her did he do that to you, because I [saw] a large[,] . . . bleeding . . . gash on her neck; she said, yes. That's when we placed [Appellant] into custody.

N.T. Trial, 6/7/17, at 13 and 15.

Philadelphia Police Officer Allen Carroll testified that he was the second officer to arrive on scene and he witnessed Appellant restraining the crying victim, R.G. (hereinafter "the Victim"), with the knife and yelling "this is not my daughter." *Id.* at 63 and 72. The officer described the knife as "a big kitchen steak knife or like a long knife – like you'll see in the movies." *Id.* at 66.

Officer Carroll testified that, after Appellant dropped the knife, he saw that the Victim "had a lot of blood all over her" and, because "she was bleeding so much," the officer immediately drove her to the hospital. *Id.* at 64. As the officer testified, "[y]ou could actually see [the Victim's] windpipe" and,

during the drive to the hospital, the Victim was "holding her own neck closed."
*Id.* at 65.

The Victim was seven years old at the time of the attack and 11 years old at the time of Appellant's trial. *Id.* at 40. The Victim testified that Appellant is her father and, on the morning of attack, she and Appellant left her grandmother's house together, so that the Victim could go to school. The Victim testified that, when she and Appellant were in front of the house, Appellant "just stood there for a second and he took out the knife" and sliced her across her neck with the knife. *Id.* at 55-58. During cross-examination, the Victim testified that she "think[s] it was an accident" because Appellant "has always been, like, a loving dad." *Id.* at 58.

Appellant's mother and the Victim's grandmother, M.B.H. (hereinafter "the Grandmother"), testified as to what occurred on the morning of June 12, 2013. She testified:

> On the morning of June 12th . . . [Appellant] came [to my house] about, approximately seven in the morning with [the Victim]. They were coming around from the other house . . . and he came, he got her ready for school. He fixed her breakfast and everything. And then he went outside. He left to go – to take her to school and I remember – I called the cops, because I didn't like the way he looked.
>
> He was on prescription drugs and stuff like that. He just wasn't looking right, so I didn't want him to drive her to school, I wanted to drive her myself.
>
> . . .
>
> [Also, when Appellant first came into my house on the morning of June 12, 2013,] I saw blood on his shirt and I

- 3 -

didn't see [the Victim]. They always come together. I didn't ask any questions, because [Appellant] was mumbling to himself and stuff, but the blood on his shirt kind of gave me an alarm. So I was, like, where is [the Victim], to myself.

So I called the police and then [the Victim] said, grandma, mommy hit daddy, but daddy got her back. So that made me more alarm[ed]. So that's when I called the police. I went to my room and I called the police.

So then I came outside. They already left downstairs to go to school. They were walking towards the van when the police came out the other side.

. . .

The police [were] coming down the street. [Appellant] was already almost at the van, but then, when the police lady came over to me, I turned to look, because I wanted to show them him. But when I looked, I saw [the Victim] standing by herself and then I saw the blood on her shirt.

. . .

[The Victim] didn't scream. She didn't say nothing. I just saw her standing. What alarmed me was the blood on her shirt.

So I screamed out to her and [told] her to run to grandma, she did. Then when I realized she got the cut here (indicating). I started screaming and then everything just went from there.

N.T. Trial, 6/8/17, at 10-13.

During the Grandmother's testimony, the Commonwealth played a recording of the 911 call she made to the police. After listening to the recording, the Grandmother acknowledged that she told the 911 operator:

"my son, I think he's high on wet.[1]  He has the baby with him.  He's about to take her to school, but he has a knife."  **See id.** at 17-20 (some capitalization omitted).

Philadelphia Police Detective Justin Montgomery testified and read from a statement that the Grandmother gave to him on June 12, 2013.  Detective Montgomery testified that he asked the Grandmother the questions and the Grandmother responded by providing him with the answers:

> [Question]: Can you tell me what took place this morning?
>
> [Answer]: My son came home to my house with the baby. When he came in, he was fussing and he was mad.  He said that she, [the Victim's] mother, busted him in the mouth. And he was going to go find her and kill her. . . .
>
> [Question]: Was [the Victim] with [Appellant] when this was taking place?
>
> [Answer]: Yes.
>
> [Question]: Can you tell me what happened after he was making these statements?
>
> [Answer]: When this happened, [Appellant] was changing the baby's clothes.  He said that he was going to take her to school.  He poured her some cereal and he was telling her to eat, because he was going to be late for work.
>
> I saw a knife on the table when he was saying these things. Like he was going to kill the mother.  I called the cops, because I was scared.

---

[1] "'Wet' . . . can be used to refer both to a marijuana cigarette dipped in liquid PCP and to the PCP component on its own, which is also used to coat ordinary cigarettes and other substances."  *What is 'Wet?' Dangerous Drug Cocktail*, *available at* https://www.livescience.com/22917-wet-pcp-marijuana.html (last visited February 11, 2020).

[Question]: Can you tell me what kind of knife was on the table?

[Answer]: First, I saw, like a kitchen steak knife. I took that away and I was hiding the knives. And then I saw a knife on the table that would have been the one in a set of knives, like, the one that you would cut meat with.

[Question]: Can you tell me, what was [the Victim] doing when this was taking place?

[Answer]: She was sitting there eating the cereal, and he was saying, hurry up, I have to go find your mother.

[Question]: What did you do after you gathered up the knives?

[Answer]: After gathering up the knives, I locked myself in my bedroom with my grandson and I called the police.

[Question]: Can you tell me, while in the bedroom, what did you hear?

[Answer]: I was hearing him say he was going to kill the mother.

[Question]: What was your son's appearance, when he arrived at your home?

[Answer]: He had blood on his shirt and he said that the mother had busted his lip.

[Question]: Can you tell me what caused you to come out of your bedroom?

[Answer]: The baby was eating the cereal, and he was telling her to hurry up. I heard him start yelling at the baby. You're just like your mother.

I came outside my room to talk to him. I walked down the stairs to the street to look for the cops.

The baby and my son were behind me, following me down the stairs to go outside.

[Question]: What took place, after you got outside?

[Answer]: When we got outside and walked to the left on the sidewalk to look for the cops, my son and the baby walked to the right. And when my son and the baby got under the tree, I saw them stop walking.

I saw the first cop car and I yelled at the cops for them to come faster. I saw blood on the baby's shirt. And the cops went over to him.

They pulled their guns out and he threw the knife in the grass.

. . .

[Question]: Can you tell me, to your knowledge, does your son use any narcotics?

[Answer]: He uses drugs, but I don't know what it is, but I heard from his brother, it's called, wet.

N.T. Trial, 6/16/17, at 14-18 (some capitalization omitted).

Finally, the Commonwealth read the following portions of the Victim's medical records into evidence:

[The Victim] presented with a ten-centimeter laceration to her left anterior neck, stretching from the left side of her neck to the midline. Cut through the skin and muscle layers, as well as fat.

The bleeding of the wound was controlled at the time of her arrival. Upon arrival, [the Victim] reported to medical professional that, quote, her father kicked her mother out of the house then threatened to kill her, and put the knife up to her neck.

She later reported that her father cut her accidentally. She later reported that her father told her, hurry up, you'll be late

for school or I'll kill you. Went into the kitchen to retrieve a knife and cut her neck.

[The Victim] was in stable condition at [Albert Einstein Medical Hospital] and a 4x4 gauze dressing was applied to her wound. An x-ray and a CT-scan did not reveal any extensive vascular injury.

Once she was stabilized, she was transported to St. Christopher's Hospital for [C]hildren by ambulance for further treatment.

. . .

[There, s]he presented with what medical professionals described as an acute injury, again, described as a ten-centimeter laceration to her neck. This required a surgical repair to close the sternal clinoid mastoid muscle, the subcutaneous fat skin.

[The Victim] tolerated the procedure well and the wound was dressed.

N.T. Trial, 6/16/17, at 53-55.

After the Commonwealth rested, Appellant testified in his own defense. Appellant testified that he accidentally cut his daughter when, while holding a knife, he tried to fix the Victim's uniform collar and the Victim suddenly moved. N.T. Trial, 7/6/17, at 30-31.

The trial court found Appellant guilty of attempted murder, aggravated assault as a felony of the first degree, unlawful restraint, endangering the welfare of children, and possessing an instrument of crime ("PIC").[2] *See id.* at 69. On September 12, 2017, the trial court sentenced Appellant to serve

_____

[2] 18 Pa.C.S.A. §§ 901(a), 2702(a)(1), 2902(a)(1), 4304(a)(1), and 907(a), respectively.

an aggregate term of ten to 20 years in prison, followed by ten years of probation, for his convictions. N.T. Sentencing, 9/12/17, at 27-28. The trial court structured Appellant's sentence in the following manner: ten to 20 years in prison for attempted murder; a concurrent term of ten to 20 years in prison for aggravated assault as a felony of the first degree; a consecutive term of ten years of probation for unlawful restraint; and, concurrent terms of five years of probation for endangering the welfare of children and PIC. *Id.* at 28-30.

On February 16, 2018, Appellant's timely post-sentence motion was denied by operation of law and Appellant filed a timely notice of appeal.[3, 4, 5] Within Appellant's briefs, Appellant raises six claims on appeal:

---

[3] The trial court did not order Appellant to file a concise statement of errors complained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).

[4] The Honorable Carolyn H. Nichols was Appellant's trial court judge and, in January 2018, Judge Nichols left the trial court bench to become a jurist on the Pennsylvania Superior Court. Since Appellant did not file his appeal until March 6, 2018, Judge Nichols did not file a Pennsylvania Rule of Appellate Procedure 1925(a) opinion in this case.

[5] Appellant's counsel initially filed a petition to withdraw and an accompanying brief pursuant to *Commonwealth v. Santiago*, 978 A.2d 349 (Pa. 2009) and *Anders v. California*, 386 U.S. 738 (1967). On March 2, 2020, this Court issued a Memorandum that denied counsel's petition to withdraw and directed counsel to file an advocate's brief, as we discovered a non-frivolous issue on appeal. *See* Memorandum, 3/2/20, at 13-14.

Before Appellant's counsel filed his advocate's brief in this case, Appellant filed a "Motion to Withdraw Direct Appeal Counsel and Motion to Proceed *Pro Se*," in which Appellant requested permission to proceed *pro se* on appeal. Based

- 9 -

[1.] Was the sentence imposed upon [Appellant] by the [trial] court on the charge of aggravated assault illegal, where that charge is required to merge with the conviction for attempted murder?

[2.] Direct appeal counsel miscarriage of justice.

[3.] Trial court's subject matter jurisdiction not invoked and Commonwealth and trial court devoid of Tenth Amendment sovereign state police power.

[4.] Unconstitutional sentences under the 6th, 8th, 10th, and 14th Amendments.

[5.] Insufficient evidence and lack of weight of the evidence.

[6.] New rule of law – *McCoy v. Louisiana*.

---

upon our Supreme Court's opinion in *Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1998), we concluded that Appellant's request to proceed *pro se* was timely. *Commonwealth v. Grazier*, 713 A.2d 81, 82 (Pa. 1998) (holding that, where "appellant filed petitions to dismiss counsel and proceed *pro se* before an appellate brief was filed by counsel," the request to proceed *pro se* was timely). Thus, we remanded this case to the trial court, to enable the trial court to conduct a *Grazier* hearing and determine whether Appellant knowingly, voluntarily, and intelligently waived his right to a counseled direct appeal.

In accordance with our direction, the trial court conducted a *Grazier* hearing and granted Appellant permission to proceed *pro se*. Appellant then filed a motion in this Court, where he requested permission "to proceed on appeal upon Appellant's Brief in Opposition to *Anders* Brief." *See* Appellant's Motion, 7/6/20, at 1. He further requested "leave to file a supplemental brief asserting new substantive – and procedural – functioning U.S. Supreme Court case law buttressing claims already presented." *Id.* We grant Appellant's motion in part and deny this motion in part. Specifically, we grant Appellant's request to proceed, on this appeal, on his brief in opposition to the *Anders* brief. We deny Appellant's request for supplemental briefing, as Appellant admits that this supplemental briefing would only serve to "buttress[] claims already presented." *See id.*

- 10 -

Appellant's Brief at 4; Appellant's Letter-Brief Objecting to Counsel's *Anders*/*McClendon* Brief, 10/1/19, at 1-38 (hereinafter "Appellant's *Pro Se* Brief").

First, Appellant claims that his sentence is illegal, as his aggravated assault conviction should have merged with his attempted murder conviction for sentencing purposes. We agree.

"Whether Appellant's convictions merge for sentencing is a question implicating the legality of Appellant's sentence. Consequently, our standard of review is *de novo* and the scope of our review is plenary." ***Commonwealth v. Baldwin***, 985 A.2d 830, 833 (Pa. 2009). Further, "challenges to an illegal sentence can never be waived and may be raised *sua sponte* by this Court." ***Commonwealth v. Tanner***, 61 A.3d 1043, 1046 (Pa. Super. 2013) (internal quotations and citations omitted).

Pennsylvania's merger doctrine is codified at 42 Pa.C.S.A. § 9765. This statute provides:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S.A. § 9765.

As our Supreme Court has explained, the "mandate of [Section 9765] is clear. It prohibits merger unless two distinct facts are present: 1) the crimes arise from a single criminal act; and 2) all of the statutory elements of one of the offenses are included in the statutory elements of the other." **Baldwin**, 985 A.2d at 833.

The Commonwealth charged Appellant with attempted murder and aggravated assault. As to the aggravated assault charge, the information declares:

<u>**COUNT 2:**</u>                    **Aggravated Assault – (F1)**

Offense Date: 6/12/13      **18 § 2702 §§ A**

(1) Attempted to cause serious bodily injury to another, or caused such injury, intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life; or

(4) Attempted to cause, or intentionally or knowingly caused bodily injury to another with a deadly weapon.

Complainant: [the Victim]

Commonwealth's Information, 9/17/13, at 1.

At first blush, under this count, the Commonwealth purportedly charged Appellant with aggravated assault under 18 Pa.C.S.A. § 2702(a)(1) and (a)(4). However, the heading of the count identifies the aggravated assault charge as a felony of the first degree – and only aggravated assault under section 2702(a)(1) is a felony of the first degree. **See** 18 Pa.C.S.A. § 2702(b) (effective 12/24/12 to 12/31/13) ("Aggravated assault under subsection

(a)(1) and (2) is a felony of the first degree. Aggravated assault under subsection (a)(3), (4), (5), (6) and (7) is a felony of the second degree"). Therefore, the Commonwealth only charged Appellant with aggravated assault under section 2702(a)(1). Moreover, the trial court found Appellant guilty of aggravated assault "as charged" and then specifically declared that it was sentencing Appellant for "aggravated assault, which is an F1." N.T. Trial, 7/6/17, at 69; N.T. Sentencing, 9/12/17, at 28-30. Thus, the trial court convicted and sentenced Appellant for aggravated assault under 18 Pa.C.S.A. § 2702(a)(1).

Our Supreme Court has held that the offense of aggravated assault under 18 Pa.C.S.A. § 2702(a)(1) merges with the offense of attempted murder. *Commonwealth v. Anderson*, 650 A.2d 20, 24 (Pa. 1994). Further, since Appellant's convictions for attempted murder and aggravated assault arose out of the same criminal activity, it is undisputed that the trial court erred in sentencing Appellant for both crimes. *See* 42 Pa.C.S.A. § 9765. To be sure, the Commonwealth concedes trial court error in this case. *See* Commonwealth's Brief at 7. Therefore, we must vacate the portion of Appellant's judgment of sentence, wherein the trial court sentenced Appellant to serve a term of ten to 20 years in prison for aggravated assault.

However, in this case, the trial court ordered that Appellant serve his sentence for aggravated assault concurrent to his sentence for attempted murder. Given this fact, our disposition does not disturb the trial court's overall sentencing scheme. We will, therefore, not remand this case for

resentencing. ***Commonwealth v. Robinson***, 817 A.2d 1153, 1163 n.14 (Pa. Super. 2003) (holding: "our disposition does not upset the [trial] court's sentencing scheme as the sentence we reverse here had been ordered to run concurrent to the sentence imposed on [another] conviction. Under these circumstances, there is no need to remand for resentencing").

Next, Appellant claims that his direct appeal counsel was ineffective for filing an ***Anders*** brief in this case. This claim is moot, as we denied counsel's request to withdraw and ordered counsel to file an advocate's brief.

For his third claim on appeal, Appellant contends that the trial court did not possess subject matter jurisdiction over his case because the Commonwealth did not properly apprise him of the crimes charged. Appellant's *Pro Se* Brief, 10/1/19, at 8. This claim is frivolous, given that the Commonwealth filed an information and formally charged Appellant with all crimes for which he was convicted. ***See*** Commonwealth's Information, 9/17/13, at 1-3.

Fourth, Appellant claims that his sentence is unconstitutional "under the 6th, 8th, 10th, and 14th Amendments." Appellant's *Pro Se* Brief, 10/1/19, at 16. Appellant's argument on this point is incomprehensible and nonsensical. The claim is thus waived. ***Commonwealth v. Spotz***, 716 A.2d 580, 585 n.5 (Pa. 1999) ("[the Pennsylvania Supreme Court] has held that an issue will be deemed to be waived when an appellant fails to properly explain or develop it in his brief").

Fifth, Appellant generically claims that the evidence was insufficient to sustain his convictions. As to this claim, we note that Appellant requests that we view the evidence in the light most favorable to him and simply accept his testimony that "he 'accidentally' cut his daughter's neck while fixing her collar" and the Victim's testimony that she believed her father cut her throat "by accident." *See* Appellant's *Pro Se* Brief, 10/1/19, at 30-31.

Contrary to Appellant's claim, our standard of review requires that we view the evidence "in the light most favorable to the Commonwealth, as the verdict winner, and [] draw all reasonable inferences in favor of the Commonwealth." *Commonwealth v. Brown*, 52 A.3d 1139, 1164 (Pa. 2012) (quotations and citations omitted). Although we will not repeat the wretched and heartbreaking facts of this case, we note that, viewed in the proper light, the evidence thoroughly supports Appellant's convictions. *See supra* at **1-8. Appellant's request that we view the evidence in the light most favorable to him necessarily and immediately fails.

Finally, Appellant claims that he is entitled to benefit from "the intervening change in law of *McCoy v. Louisiana*." Appellant's *Pro Se* Brief, 10/1/19, at 32. This argument is also incomprehensible and, thus, waived. *Spotz*, 716 A.2d at 585 n.5.

Judgment of sentence vacated in part. Appellant's "Motion to Proceed upon Appellant's Opposition Brief to *Anders* Brief" granted in part and denied in part. Jurisdiction relinquished.

- 15 -

Judge Nichols did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/3/20